Number 181794, C.D. et al. v. Natick Public School District et al. Mr. Wisch, I believe you're on. Good morning. Good morning. May it please the Court, my name is Benjamin Wisch, and along with Laurie Martucci, it's my honor to represent the appellants, C.D. by and through her parents and ex-friends, M.D. and P.D. Judge Cuella, may I reserve three minutes for rebuttal? Three? Yes. Yes. Thank you. All the parties here to this appeal agree that the free, appropriate public education element of the Individuals with Disabilities Education Act is indispensable. But Congress, through that act, did far more than simply assure alone that students are It took concrete steps to require that every school district in the country not remove a child from a general education classroom unless that child cannot be provided a meaningful educational benefit with the full range of supplementary aids and services. Counsel, we've actually had a number of special needs cases. We're very familiar with it. We have a standard of review here. The trial court tends to be deferential to the factual findings of the BSEA. And then we have a sort of sliding standard of review with de novo review of pure issues of law. What are the pure issues of law that you are presenting? Yes, Your Honor. The pure issues of law as to the least restrictive environment requirement are, first, that the district court failed to ask the question of whether NAIDC considered whether C.D. could be educated in a general education classroom with the full range of supplementary supports and services. Second, the district court erred as a matter of law by failing to require that NAIDC seek to modify the curriculum in the general education classroom in order to educate C.D. in that environment. And third, the district court erred as a matter of law to properly articulate the balancing which must occur between the panoply of benefits in the general education classroom as compared to the punitive academic benefits in the substantially separate classroom, here the access classroom. I don't understand the last point. Could you be more specific about what you mean? Yes, Your Honor. The law is clear. This court's established it, and Roland M. and Len, and it's clear throughout the country that the balancing that must occur as part of the standard on the least restrictive environment requirement is a balance between... Okay, you've asked us to adopt the Roland M. standard? The Daniel R.R. Sorry, the Daniel from the Fifth Circuit. Is that what this argument is about? Yes, it is, Your Honor. Why should we adopt it? The First Circuit law seems to have been quite adequate to address these concerns. Yes, Your Honor. The correct place to start, I would suggest, is exactly with the statutory language here. Which is what we use. It's the Fifth Circuit that has embroidered a little on that language. I appreciate that point, Your Honor. I'd suggest respectfully that the Fifth Circuit has not embroidered. The statute is crystal clear. We use the language itself as the measure. Why should we adopt any judicially crafted test other than that language? Because it actually follows the statute precisely. And that standard quotes, in fact, from the statute in order to... So do ours. Your Honor, to turn to this court's decisions that have mentioned the least restrictive environment requestion, it's undisputed here, appellees haven't disputed this point, that this court has simply never had the opportunity to consider whether a proposed IEP, an individualized education program, violated the Act because it proposed removing a child from a general education classroom. Rather, the cases in which this court has set up standards under the Act in Roland M., Lessard, and otherwise, have related primarily to situations where parents have their complaint with the proposed IEP was that it failed the free appropriate public education requirement. And in fact, if you refer to appellees' briefs, this is crystal clear because the standard, as appellees put it, both NAVIC and the BSEA, that this First Circuit has set out, is solely a balancing test. What they say this First Circuit's law is, is a balancing between the general education benefits and the benefits in the substantially separate classroom. That's certainly part of the analysis, but the First Circuit has not stated exactly what it means for a school district to comply with the statutory mandate that a child is only removed from a general education classroom if that child cannot receive a FAPE in the classroom. The Supreme Court, however, has, although it has not set out a full standard on this, as recently as an Andrew F., very recently, the Supreme Court has said... Okay, as to Andrew F., not Andrew, the First Circuit, in our Johnson opinion, was it, says First Circuit law complies with Andrew F. Okay, so that's a given. So what do you think, given that, Andrew F. now requires us to do? Your Honor, the respect in which Johnson ruled under Andrew F. was as to the FAPE requirement, and I'm happy to address that, and I will do so in just a moment. The point I was citing Andrew F. for just a moment ago, however, was in the LRE context. Andrew F. reaffirmed that the statutory mandate under the Act is that a child is to remain in a general education classroom, quote, whenever possible. Here's the difficulty I'm having. We have an express finding by the hearing officer that the IEP was reasonably calculated to provide with a FAPE in the least restrictive environment. So with that factual finding, it seems to me that's what the aim of the statute is, and the hearing officer is saying that's precisely what they did. I don't see you pointing to anything in the record that shows they didn't do it, and instead, when I read the record, I find a statement by, I think it's Sovereign, one of the school officials, that their aim was to go class by class assessment with the aim of having her contained or restricted as little as possible. So you have a school saying that their aim was to have her restricted as little as possible, and you have a fact finding by the hearing officer who's experienced in this area. How do we step in and say, well, that's wrong? Your Honor, you are exactly right that that is the factual finding the hearing officer made. However, in making that factual finding, it applied exactly the opposite of the statutory mandate. This is a quote from the clarification order by the BSEA appellant's addendum, page 79, reads, NADAC's proposed IEP for the 2012-13 school year would have provided students with the opportunity in the access program to independently access curriculum at her level rather than relying on aids as would have been required in a general education setting. That factual finding, Your Honor, is the BSEA concluding that C.D. could have been educated in the general education classroom. That's kind of reading. If that were the only thing that the hearing officer said, I think you could say that one might draw a negative inference, as you have done, that they've done that. But when you read it in the context of the other findings, specifically the one that he specifically found, that this was the least restrictive environment, how do you draw that negative inference? Much less say it's mandatory that we draw that. First, I would say that the conclusion of what is a least restrictive environment is the conclusion of law or, at best, a mixed question of fact and law. But here they made clear their aim was to try to get her into the general education as much as possible. They felt their aim should be to capitalize on her ability to make connections with other students, and that's what they were trying to do. It sounds like you had school officials here, if we deemed them credible, as the hearing officer did, who were trying like the Dickens to get her in education, but do it as much as possible in the general curriculum, which is what we wanted to do. Your Honor, and I would submit that under Greer and under Indureff, which explains that by the time a matter comes to adjudication, there should be a cogent explanation in the record for why the is in transcripts and especially in the IEP, such that if the district court here had inquired whether the school district actually made the effort to consider the full range of supplementary supports and services, the court there would have immediately recognized they did not do so by reference to the original IEP at issue here, the 2012-2013 IEP, referring to record appendix here, page 2864, where Natick, in response to the question, in the IEP, what rejected options were considered and why was each option rejected? Natick wrote, without referencing general education whatsoever, without referencing supplementary supports in general education whatsoever, the option to provide special education services through replacement classes was discussed by the team and rejected by the district. In other words, Your Honor, if the court had asked the correct legal question, which the BSEA also did not ask, it would have immediately recognized that Natick did not make that requisite effort. I would also submit, Your Honor, that the quote here I just read from addendum 79 is not an out-of-context single point. If you refer to the original order from the BSEA, addendum 15 is the original BSEA order where the BSEA discusses this, it says, again, that the access program would be less restrictive because CDE would not need aids and support, supports and services. If that were the law, Your Honor, as the BSEA understood it, as the district court failed to recognize because it did not ask the correct question of law, then every school district, everywhere in the country, would be incentivized to send children with disabilities to substantial Was there an objection to the specific questions that the judge asked? As I understand it, the judge actually went back to the hearing officer here and asked for a clarification. You're now telling us that the judge erred when he did that because there was a specific question about aids in the classroom that the judge did not ask to focus on. Did you pose that precise question and object when it was left out in the clarification order? Your Honor, not in immediate response to the clarification order, but in the supplemental, I would refer the court to the Memorandum of Law in support of supplemental motion for summary judgment, which is actually a native exedendum. You got to the point here where the judge is trying to narrow stuff down. The judge then says, I'm going back to the hearing officer. That's an accomplishment for yourself, going back to the hearing officer and asking to clarify. Here's what I wanted to clarify. Was there then an objection to that clarification order on the grounds that it omitted what you're now telling us is the essential question that should have been asked? There was not at that time, Your Honor, but it was later raised through the supplemental motion for summary judgment, which the district court allowed. And for that reason, the issue was well-preserved below. But it's quite vague for us to say that school officials, in the first instance, and the hearing officer, and the other, were so required to focus on a specific formulation and issue that we're going to reverse it, when that issue wasn't even apparent apparently at the time that the clarification order was being drafted to any of the lawyers litigating the case. Your Honor, it was apparent to the lawyers litigating the case. Then why wasn't there an objection? It was set out at the time. I can't speak to why there was not an objection at that time, but it was in the prior summary judgment briefing, including the clear statutory language requiring supplementary supports and services. Thank you. Ms. Rueger-Mann, good morning. Good morning, Your Honors. So there are three issues that are raised in this appeal. I'm going to start with the least restrictive environment, since that's where the majority of the questions seem to be. No, please don't restrict yourself. It's true he didn't reach the other issues. That doesn't mean we're not interested. So start with that and go on. So first and foremost, I just want to reiterate what's said in the brief, that the appellants have not preserved their argument about the Daniel R. R. test. Judge Lynch, as your questions indicated, the test that the First Circuit has applied is consistent with the statutory language that you look at free and appropriate public education and least restrictive environment together as one package. And I think that it's in accordance with both Andrew F. and the statute. If you look at our case law that talks about the First Circuit, the IEP has to be looked at as a whole, weighing and balancing pieces rather than component parts. And here, the appellant's brief focuses solely on least restrictive environment and ignores the faith piece. When you look at the record and how the appellants characterize the record, they're not giving the deference to the factual findings of the district court or the BSEA. They ignore what was found, especially about CV skills. I mean, this is a student who was at a first grade instructional level, elementary level for reading, 2.7 grade level for math. Unlike other cases at the appellant's site, the parent's own experts testified in a hearing that she could not be educated in a general education setting. And so when you're looking at faith and least restrictive environment together, she is a student pursuant to their own experts that had significant deficits across language area, receptive and expressive language, who needed instruction in a way where she had difficulty managing oral, real language, difficulty accessing information. She needs spiraling of language-based instruction. That is not instruction that can be provided in a general education classroom. As I understand, the key argument from the other side is that in determining that she could not sufficiently benefit in the least restrictive environment, they're claiming that the school officials failed to consider the possibility of having additional services and specifically aids present in the classroom as she had in earlier years of her education. So what do you say to that, that the school failed to even consider that and therefore too narrowly defined the options available? I mean, the first question is what will allow her to make effective progress. I think when you look at her scores and you look at her profile, what she required was different instruction. That's not something that can be provided by having an aid in the class. And when you look at some of the cases that they're citing, like Daniel R.R., just for the factual premise, there's no point. Mainstreaming doesn't require you putting a student with an aid in the classroom if they're not going to be able to access the curriculum. What she really required To what do you point us in the record on that she required different instruction as opposed to someone to assist her with the general instruction? So I think if you look at their experts report, Dr. Gibbons, she talks about this. They also at the hearing had learning prep people testify who at the school where she was unilaterally placed who also testified this. They also had a report from Dr. Ember that again talked about her deficits in communication as well as her very significant below her elementary level school. This was a girl who's going into high school. And so when you're thinking about this, we as was asking the questions, try to include her to the maximum extent appropriate. So the proposal was for her to be in general education electives. If you look at the record in terms of the description of the access program, general education students came into the access program on a regular basis. And so the goal was to include her as much as possible and throughout the year. You can see that they were constantly revising the IEP as she was ready to move into a more inclusive setting. But again, given at the time where her profile was, she would not be able to receive instruction in a general education classroom. You said there are three issues. Yes. So I can move on to the transition assessment and transition planning next. And so there are two different pieces. The first is a transition assessment. So I'll start there and then I'll go to the actual transition planning. And so a transition assessment, DECI has issued guidance about what is a transition assessment. And if you look at that guidance, it's clear that a transition assessment is any assessment that's conducted when a student is on vision, needs, strength, and preferences. And when you continue to look at that advisory, it talks about a all student model, some student model, and a few student model in terms of what is a transition assessment. And it says for all students, transition assessments could be MCAS, report cards, achievement tests, work-based learning, preference surveys, student or family interviews. It says for some students, a transition assessment would be more in-depth information like personality surveys. And for a few students, a transition assessment would be adaptive behavior assessments, functional vocational evaluations, life skills, inventory. And as the appellants acknowledge in the brief, there's nothing in the IDA or in the case law that describes what is required for a transition assessment. It's really an individualized determination. And so NENIC had enough, had transition assessments through whole school programming, through MCAS scores, through the report cards, through the evaluations that were done by Dr. Ember, that that was what constituted a transition assessment for the 9th and 10th grade. And then the 11th grade, they did a formal transition assessment. And so NENIC's position is that it did meet the age-appropriate transition requirement under the IDA. And then next going, using the transition assessment in terms of transition planning, here the district court concluded that the NENIC appropriately transitioned planned. As the district court said, there was a discussion at that July 2012 meeting and the May 2012 meeting about the parents' goals and the CD's goals to graduate, but they wanted her to have a high school diploma. That is a transition goal. And then as a result, the Native Public Schools planned for that transition goal in its IEPs in the 2012, 2013, 2013, 2014 school year. CD, as an entering 9th grader, like many entering 9th graders, was unsure about what she wanted to do, but her goal at that time was to graduate high school. And so the team's focus on functional academic goals and the IEP are transition services. And then the last piece is NREF. I know that there was a question. So I would say that Johnson made clear that NREF did not change the standard in this circuit and that the district court and the BSEA both stated that they applied the NREF standard. And then going back to Russ. So even if we assume that's so, some of the amicus have said to us, you know, there's some language in some of your earlier cases that maybe you ought to take the opportunity to clear up that sound like the obligation is to provide de minimis services. I don't actually read our case law to say that, but do you have a view one way or the other? I agree. I think our case law has been pretty clear that we apply the NREF standard. But I think to the extent there was any question, I think you clarified that in Johnson by saying that the standard that we apply, meaningful educational benefit, comports with NREF. What does the school district do if it finds that in a general mainstream environment, it can, with services and aids, provide a sufficiently enhanced and quality education that it exceeds or meets or exceeds the NREF standard? It's challenging and whatever, but that in a more restrictive environment, it could provide an even better educational environment. What do you read our case law as saying that the district should do in that situation? Should it go for the lower education in the mainstream environment or the higher education in a non-mainstream environment, assuming both degrees of education exceed the NREF minimum? So, I mean, I know the first year that you supply a maximum benefit standard, that's not the standard anymore. The NREF standard is about making effective progress. And so I think if a student can receive, make effective progress in a general education setting, that that's where the student would be. It's not about maximizing the benefit in a special education setting. There are no other questions. I know I've got four seconds left. Three. Thank you. Good afternoon, Your Honors. Assistant Attorney General Honorary George Segal on behalf of the Bureau of Special Education Appeals. Could you speak up, please? Thanks. Honorary George Segal on behalf of the Bureau of Special Education Appeals. I'm starting first with the FAPE standard, the Free and Appropriate Education. As has been noted repeatedly, the Johnson matter in 2018 squarely addressed that NREF comports with the First Circuit standard, meaningful educational benefits comports with the standard announced in NREF. There is no reason to go further than that. Since 2012, at least in the DB case, and I believe in the Sebastian M case, this circuit has been clear about the meaningful educational benefits. So notwithstanding any prior case law that may have caused some individuals confusion, the standard has been clear in the First Circuit since 2012, and there's no need to clarify that, disturb that, and NREF did not disturb that in any way, they found in Johnson. With respect to the least restrictive environment, this circuit has crafted a test that echoes the preference for mainstreaming, but balances that against the demand that students with disabilities be educated in an environment that provides them with access to a free, appropriate public education. There may be some natural tension between those two requirements and circumstances such as this, but that is readily accommodated for by the balancing test that has been adopted by the circuit in cases such as Roland M. So let's take Judge Kayata's hypothetical. The school system actually could provide a more mainstream, but lesser educational benefit, or it could provide a less mainstream, but greater educational benefit. I assume that that would be discussed with the parents, and if the parents agreed with the choice, that ends the matter, and it doesn't end up in litigation. But suppose the parents disagree, and they want one or the other. Is it baked into the law that then, even if the parents would have preferred the more education, but the school system says, no, no, we have to mainstream, is it baked into the law that the parents' wishes get disregarded at that point, and, you know, should the court do the balancing, or should that be left to the school systems? I don't think that the parents' preferences are disregarded, but they do not rule the day, and there's case law that says that, even if the parents would prefer more ideal education, that's not what's guaranteed under the Act. What's guaranteed under the Act is an adequate... No, no, no, you've missed the premise. The premise is both of these satisfy me, Andrew F. What I'm asking is whether overriding the judgment of the parents, school systems will feel obliged to mainstream. In a situation where the child would gain benefits from being mainstreamed, in addition to the education benefits, yes, that would be an appropriate determination for the school system to make. And suppose the system makes the opposite determination? Has that been error? Not necessarily, Your Honor. It could be that this is a student who has behavioral issues, who does not have the social adaptive skills to benefit from the benefits of the mainstream environment. We're looking at the student as a whole package. This is not purely about academic progress. So, in a way, you're suggesting the hypothetical will actually never occur? It will be a fact-specific inquiry, and the First Circuit standard accommodates for that by defining a fulcrum and a balancing act to find sort of the right spot along that that's contingent on each individual child. The question is who does the balancing? The school district in the first instance, Your Honor. And then the BSEA would ensure that that had been conducted appropriately by a preponderance of the evidence. So, in light of that answer, it's mentioned in the briefs that the parents then took the child out of school and put into a private setting, but that the private setting itself was not a mainstream setting. I assume that's mentioned in the briefs because you think we should give some significance to that in our evaluation. What is that? It's somewhat telling that their objection to the access program in particular was the lack of mainstream opportunities and then to place this student in. It isn't necessarily directly pertinent to the analysis of the IEP under the FAPE and the LRE. It would come in if you're looking at the question of reimbursing the parents, which is something the adequacy of the alternate placement has not been addressed. Thank you, Your Honors. Thank you. Jewish? Thank you. I'd like to address first Judge Kiatta's question about modifying the curriculum. And I would like to be particular here also to address Judge Lynch's original question about whether Daniel R. effectively was embroidery on the statutory language. I refer the court to 34 CFR section 300.116 subsection E, the regulations under the act, which encapsulate one of the key parts of the Daniel R. test as the modification. Quote, in determining the educational placement of a child with a disability, including a preschool child with a disability, each public agency must ensure that a appropriate regular classrooms solely because of needed modifications in the general education curriculum. In the same way, the Daniel R. test requirement for consideration of general education classroom with the full range of supplementary aid and services is reflected in the regulations under the act. That's going to be an issue of degree, isn't it? I mean, you can have a modification or you could have an entirely different curriculum. I don't think it's telling us the latter. I agree with you, Your Honor, which is why we make clear in our belief that Daniel R. is not a prescriptive test. It's not telling. On Daniel R., why, if there's a statute that Congress has drafted that gives us instructions what to do, and there's an agency of the federal government that promulgates regulations under that in effect tests or factors or regulations themselves, shouldn't we just base our decision not on what some court has added on, but rather what Congress and what the regulations say? Your Honor, it's because, as reflected in this case at the BSEA, it's not clear where the district, where, as you just heard the argument from appellees, their contention is that this with no consideration of the supplementary supports and services. That's not what the statute says. That's why courts have appropriately stepped in to provide instruction on the law to be applied that school districts must seek to consider, not what they must do in the end, but they must seek to consider very quickly to address the transition assessments point. You heard a lot of argument, Your Honor, you heard a lot of argument about exactly what transition assessment may be required. Respectfully, that is beside the point, because both Natick and the BSEA have conceded that no transition assessment whatsoever was conducted for C.D. from 2012 until 2014, when she was about 17 and a half. In the BSEA's decision, addendum to page 18, the BSEA concedes it's true that Natick had not yet conducted a transitional evaluation and might have adjusted benchmarks after conducting it. May I conclude this point? You may finish. Thank you. Briefly. Record Appendix 2636 Natick, and this is in hearings before the BSEA, testified under questioning by counsel whether a transition assessment was conducted. The response was not a formal one. Then the question was, was there any form of assessment between 2012 and 2014? The answer was no. Thank you. Thank you.